**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 19-cr-264-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.    TIMOTHY SPIKES**,
**2.    SYLVIA MONTOYA**,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE TO SUPPRESS EVIDENCE AND REQUEST FOR ORAL ARGUMENT AND DENYING DEFENDANTS' JOINT MOTION REQUESTING A *FRANKS* HEARING**

---

The Government charges Timothy Spikes with: (1) one count of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i); (2) one count of possession with intent to distribute a mixture or substance containing a detectable amount of cocaine base, a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (3) one count of possession with intent to distribute a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (4) one count of possession of a firearm / ammunition by a prohibited person, 18 U.S.C. § 922(g)(1); (5) one count of possession with intent to distribute 28 grams or more of cocaine base, a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii); (6) one count of

possession with intent to distribute 5 grams or more methamphetamine (actual), a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); (7) one count of maintaining a drug premises, 21 U.S.C. § 856(a)(1), and (8) one count of possession with intent to distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (ECF No. 1.)

The Government also charges Sylvia Montoya with (1) one count of possession with intent to distribute 28 grams or more of cocaine base, a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii); (2) one count of possession with intent to distribute 5 grams or more methamphetamine (actual), a Schedule II controlled substance, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); and (3) one count of maintaining a drug premises, 21 U.S.C. § 856(a)(1).  (*Id.*)

Before the Court is Defendants' Joint Motion to Dismiss Indictment Or In The Alternative To Suppress Evidence and Request for Oral Argument ("Motion to Suppress"), filed April 20, 2020.  (ECF No. 68.)  The Government responded on May 6, 2020 (ECF No. 72), Defendants replied on July 15, 2020 (ECF No. 78), and the Government filed a sur-reply on August 19, 2020 (ECF No. 84).

Also before the Court is Defendants' Joint Motion Requesting a *Franks* Hearing ("*Franks* Motion"), filed on January 29, 2021.  (ECF No. 108.)  The Government responded on February 16, 2021 (ECF No. 110), and Defendants replied on March 15, 2021 (ECF No. 112).

For the reasons set forth herein, the Motion to Suppress is granted in part and denied in part, and the *Franks* Motion is denied.

2

# I. BACKGROUND[1]

On March 6, 2019, Investigators Jeffery Wheelis and Andrew Merino from the Aurora Police Department ("APD") narcotics unit were conducting visual surveillance of the Summit View Inn located at 11800 East Colfax Ave., Aurora, Colorado (the "Motel"). (ECF No. 168 ¶ 1.)  The Motel has a history of criminal conduct including narcotics transactions, prostitution, robberies, gang activities, and shootings.  (*Id.*)

## A.    Traffic Stop of the 2019 Charger

At approximately 11:55 a.m., Investigators Wheelis and Merino observed a white 2019 Dodge Charger (the "2019 Charger") pull into the motel parking lot and saw an unknown African American male—later identified as Spikes—exit the driver's side of the vehicle. (*Id.* ¶ 2.)  Spikes spoke briefly with another unknown African American male in the parking lot before walking into motel room #205.  (*Id.*)  Investigators Wheelis and Merino observed a number of people walking in and out of the motel room.  (Tr. II at 122.)[2]  Thereafter, Spikes left the motel room and drove away.  (ECF No. 68 ¶ 3.)  Investigators Wheelis and Merino contacted APD Patrol Officer Peter Ponich and conveyed their observations.  (*Id.*)

At approximately 12:17 p.m., Officer Ponich pulled over Spikes on suspicion of a traffic violation for having windows that are illegally tinted.  (*Id.* ¶ 4.)  After running

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.  This factual summary is taken from the parties' briefs and supporting exhibits, as well as testimony from the evidentiary hearing.

[2] As of the date of this Order, the parties have not requested an official copy of the full Evidentiary Hearing transcript.  Thus, in this Order, the Court will cite the two draft volumes of the Evidentiary Transcript prepared by the court reporter ("Tr. I" and "Tr. II").

Spikes's license and registration, Officer Ponich asked Spikes to exit the vehicle to await the arrival of another officer who was bringing a window-tint meter to measure the tint on the 2019 Charger. (*Id.* ¶ 5.) Officer Ponich conducted a pat-down of Spikes, which did not uncover any weapons or contraband. (*Id.*)

**B.     K-9 Puck Sniff of the 2019 Charger**

While waiting for the tint meter to arrive, APD Officer Eric Dortch arrived at the scene with his K-9 patrol dog ("K-9 Puck"). Investigator Dortch deployed K-9 Puck around the exterior of the 2019 Charger, despite Spikes's repeated statements that he did not consent to a search of his vehicle. (*Id.* ¶ 8; ECF No. 68-5 at 12:30.)

Investigator Dortch testified that K-9 alerted to the odor of narcotics outside the vehicle. (Tr. I at 63–65; ECF No. 72-1 ("I deployed K-9 'Puck' around the exterior of the vehicle starting at the rear driver side bumper. K-9 'Puck' alerted to the passenger side door, by rising onto his hind legs, and intense sniffing at the door seam and door handle. This alert indicated to me that the odor of a controlled substance was present within the vehicle. K-9 'Puck' again alerted to the driver side door by rising onto his hind legs, a severe head whip and intense sniffing at the door seam and door handle. This alert again indicated to me that the odor of a controlled substance was present within the vehicle.").)

Thereafter, K-9 Puck was then deployed inside of the Spikes's vehicle, where Investigator Dortch testified that K-9 Puck gave a final indication to the odor of narcotics in the area of the front center console and dash near the glovebox and front passenger seat. (Tr. I at 73; ECF No. 72-1 at 1 ("I deployed K-9 'Puck' on the interior of the

vehicle.  K-9 'Puck' spent most of the time focused on the front passenger seat and front dashboard and center console area of the vehicle.  K-9 'Puck' alerted in this area with intense sniffing, and then indicated on the front center console and dash near the glove box and front passenger seat by stopping and staring.  This is an indication that the odor of a controlled substance is present within the specific area.").)

Defendants dispute that K-9 Puck gave either an alert or positive indication to the odor of narcotics in or around the 2019 Charger.  (ECF No. 68 at 15–17.)

## C.    The First Search of the Charger

After deploying K-9 Puck, Investigator Dortch conducted a hand search of the 2019 Charger, which did not reveal any contraband.  (*Id.* ¶ 9.)  He did, however, find a large amount of unused Ziploc sandwich bags on the rear passenger floorboard and three cell phones in the center console.  (ECF No. 72 ¶ 11.)  He unsuccessfully attempted to open a locked glove compartment, and Spikes refused to provide him with a key for the glove compartment.  (*Id.*)  Investigator Dortch then decided to impound the vehicle while he applied for a search warrant.  (ECF No. 68 ¶ 9.)

At approximately 12:33 p.m.—after Investigator Dortch deployed K-9 Puck—APD Sergeant Jonathan Carelock arrived at the scene of the traffic stop with a window-tint meter.  (*Id.* ¶ 6.)  He determined the front passenger window of the 2019 Charger only allowed 5% of light transmission to pass through, below the state limit of 27%.  (*Id.*)

At approximately 12:58 p.m., APD Officer Kenneth Forrest arrived on the scene and completed an inventory search and vehicle report form.  (*Id.* ¶ 10.)  The 2019 Charger was then towed to the APD evidence bay.  (*Id.*)

At approximately 1:04 p.m., Officer Ponich issued Spikes a municipal traffic

summons for unlawful window tinting.  (*Id.* ¶ 11.)  Spikes was then released.  (*Id.*)

**D.    The Second Search of the Charger & Search Warrant Application**

The 2019 Charger was equipped with a Momento M5 audio and video recording dash camera device (the "Dash Camera").  (*Id.* ¶ 12.)  The Dash Camera has a motion sensor that triggers audio and video recording to a SD memory card (the "SD card") while the 2019 Charger is parked.  (*Id.*)

Investigators Wheelis and Merino conducted a second search of the 2019 Charger at the APD evidence bay.  The following day, on March 7, 2019, Investigator Wheelis authored and submitted an application for a search warrant of the 2019 Charger.  (*Id.* ¶ 14.)  An Arapahoe County Magistrate Judge authorized the search warrant on March 11, 2019.  (*Id.*)

On March 12, 2019, Investigator Wheelis obtained access to the 2019 Charger's glove compartment and discovered a semi-automatic pistol, a digital scale, cocaine, and methamphetamine.  (*Id.* ¶ 15.)

**E.    The Arrest Warrant & The Arapahoe County Case**

On March 26, 2019, Investigator Wheelis authored and submitted an application for an arrest warrant of Spikes based on evidence discovered from the March 6, 2019 search of the 2019 Charger.  (*Id.* ¶ 16; ECF No. 68-1.)  An Arapahoe County District Court Judge signed and authorized the arrest warrant on March 28, 2019 (the "Arrest Warrant").  (ECF No. 68 ¶ 16.)

Thereafter, state prosecutors charged Spikes in the 18th Judicial District State Court of Colorado, Case No. 19CR913 (the "Arapahoe County Case").  (*Id.* ¶ 17.)  On May 31, 2019, the Arapahoe County Case was dismissed on a motion by the

prosecution.  (*Id.* ¶ 23.)

**F.      March 28, 2019 Arrest & Search of Spikes & the Denver County Case**

On March 28, 2019, the Denver Police Department ("DPD") arrested Spikes

pursuant to the Arrest Warrant.  (*Id.* ¶ 18.)  At the time, Spikes was a passenger in a

2018 black Dodge Charger (the "2018 Charger"), which was driven by Montoya.  (*Id.*)

Officers detained Montoya at the scene but released her without charges.  (*Id.*)

A search of the 2018 Charger uncovered $3,000 in U.S. currency and an empty

clear bag in the center console.  (*Id.* ¶ 20.)  The 2018 Charger was then seized and

towed to the DPD vehicle impound lot and held as evidence.  (*Id.*)

DPD officers took Spikes into custody by and transported him to the DPD station.

(*Id.* ¶ 19.)  At the station, Sergeant Foster authorized a strip search of Spikes, which

revealed heroin.  (*Id.*)

On April 2, 2019, state prosecutors charged Spikes in Denver District Court with

multiple felony drug offenses (the "Denver County Case").  (*Id.*)  On June 14, 2019,

Spikes's Denver County Case was also dismissed.  (*Id.* ¶ 23.)

**G.  Spoliation of Pole Camera Evidence**

After learning that Spikes was connected to Montoya—a Denver Sheriff's

deputy—DPD investigators installed a mobile HALO pole camera (the "pole camera") to

view the parking lot of the 3966 S. Wadsworth Blvd., Lakewood, Colorado (the

"Wadsworth Apartment") in March 2019.  (ECF No. 72 at 8, 21; Tr. II at 62–65.)

On June 14, 2019, pursuant to the Discovery Conference Memorandum and

Order, the Government specifically indicated that it had "Electronic surveillance of the

Defendant or his premises: pole camera," in its possession and that it would permit

discovery of the video surveillance. (ECF No. 16 at 5.). Montoya's counsel also requested the pole camera footage on December 18, 2019. (ECF No. 72 at 21.)

The Government and DPD Sergeant Anthony Foster contend that they learned at that time that, as a matter of course and unless requested, the pole camera footage was not retained past thirty days from when the pole camera was removed. (*Id.* at 21; Tr. II at 68.) The Government received sixteen screen shots from the pole camera from law enforcement that were saved and provided these photos to the defense as supplemental discovery on February 10, 2020. (ECF No. 68 at 22.)

## H.    Search of the Wadsworth Apartment

On March 28, 2019, DPD detectives authored and were approved for a search warrant for the Wadsworth Apartment. (*Id.* at 21.) As a result of the executed search warrant, DPD officers seized $1,342 in U.S. currency, crack cocaine, heroin, methamphetamine, miscellaneous paperwork, four digital scales, and drug paraphernalia. (*Id.*)

## II. MOTION TO SUPPRESS

Defendants argue that the Court should dismiss the Indictment or, in the alternative, to suppress any and all evidence seized as a result of law enforcement's (1) March 6, 2019 search of the 2019 Charger; (2) March 28, 2019 search and seizure of Spikes's person pursuant to the Arrest Warrant; (3) March 28, 2019 search and seizure of the 2018 Charger; and (4) March 28, 2019 search of the Wadsworth Apartment. (ECF No. 68 at 1.)

## A.    Burden of Proof

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people

to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal citations and quotation marks omitted). Under the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment. *Id.*

On a motion to suppress evidence derived from a warrantless search and/or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id.* at nn.1–2 (citing authorities).

## B.    Analysis[3]

### 1.    March 6, 2019 Search of the 2019 Charger

Defendants argue that the Court should suppress all evidence obtained in the "illegal seizure, detention, and search of Spikes's vehicle in violation of the Fourth Amendment as it was not reasonably related in scope to the circumstances which justified the initial stop and was not supported by reasonable suspicion of criminal

---

[3] In the Motion to Suppress, Defendants do not detail whether Spikes, Montoya, or Spikes *and* Montoya are arguing that their Fourth Amendment rights were violated by the various events at issue herein. The Court has substantial doubts about whether both Defendants have standing to challenge all of the evidence at issue in the Motion to Suppress. Because neither party raised an argument on this topic, the Court will not consider it. Nonetheless, Defendants are advised that they may not make joint arguments in the future

activity." (ECF No. 68 at 7.)  As such, the Court will analyze the reasonableness of APD's actions at each stage of the March 6, 2019 encounter.

a.    *The Initial Traffic Stop of the 2019 Charger*

Although Defendants argue that APD "illegal[ly] seize[d]" the 2019 Charger, they do not argue that the Officer Ponich lacked probable cause to conduct the initial traffic stop of the 2019 Charger on March 6, 2019.  (ECF No. 68.)  Nor could Defendants reasonably make this argument, as Colorado Revised Statute § 42-4-227(1)(A)(I) states that

> no person shall operate a motor vehicle registered in Colorado on any window, except the windshield, is composed of, covered by, or treated with any material or component that presents an opaque, nontransparent, or metallic or mirrored appearance in such a way that it allows less than twenty-seven percent light transmittance.  The windshield shall allow at least seventy percent light transmittance.

Because Officer Ponich observed a suspected window tint violation, the Court finds that the Fourth Amendment supports his initial decision to stop the 2019 Charger.  *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (recognizing that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring" and that "[i]t is . . . irrelevant that the officer may have had other subjective motives for stopping the vehicle").

b.    *Length and Scope of the Traffic Stop*

A routine traffic stop is considered a seizure within the meaning of the Fourth

---

unless they have an independent basis to do so.

Amendment, *see United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008), and is analyzed "under the principles applicable to 'investigative detentions,'" *United States v. Doyle*, 129 F.3d 1372, 1375 (10th Cir. 1997). "[A] traffic stop is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015) (citation omitted); *see also United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004) (recognizing that within "the context of routine traffic stops, a law enforcement officer may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate").

A "[p]olice stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). Instead, an investigative stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Further detention is appropriate only if, during the course of the traffic stop: (1) the officer develops an "objectively reasonable and articulable suspicion" that the driver is engaged in some illegal activity, or (2) "the initial detention . . . become[s] a consensual encounter." *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996) (quotation omitted).

Defendants argue that "officers did not have reasonable suspicion to expand the scope of Spikes['s] detention into a narcotics investigation by requesting a K-9 search and unlawfully prolonged the detention by waiting for the K-9 search to occur." (ECF No. 68 at 8.)

In response, the Government argues that Officer Ponich's actions during the stop were reasonably related in scope to the mission of the traffic stop and that "[w]hile waiting for the tint meter to arrive, Investigator Dortch deployed K-9 Puck and conducted a sniff of the vehicle."  (ECF No. 72 at 12–13.)  The Court agrees.

Defendants' contention that law enforcement unlawfully prolonged the traffic stop by waiting for a K-9 to arrive to the scene is contradicted by the record.  At the time that Investigator Dortch arrived to the scene with K-9 Puck, Officer Ponich was waiting for a tint meter to arrive, which would then be used to determine the percentage of light being transmitted through Spikes's vehicle windows to complete his investigation into the suspected traffic violation.  Critically, K-9 Puck's sniff of Spikes's vehicle occurred *before* Sergeant Carelock arrived with the tint meter.  (*Cf.* ECF No. 68-5 at 11:23 (K-9 Puck is observed walking around Spikes's vehicle before Sergeant Carelock arrives with the tint meter).)  As such, the 2019 Charger was not improperly seized while waiting for K-9 Puck's sniff.  *See United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990) (holding that because K-9 sniff alerted to defendants' vehicles before officers completed their inspection of defendants' documents at a roadblock—which was the purpose of the initial detention—there "was not a 'seizure' of the defendants' vehicles for purposes of facilitating the canine sniff").

Likewise, the tint meter arrived within approximately fifteen minutes, which is a reasonable amount of time to complete the initial purpose of the traffic stop.  *Cf. United States v. Briseno*, 163 F. App'x 658, 664 (10th Cir. 2006) (19 minutes is a reasonable amount of time to question the driver and passenger and verify their information).

As such, the Court concludes that the traffic stop was not unnecessarily prolonged to further an investigation and instead lasted only as long as necessary to confirm the suspicion that justified the initial stop of the 2019 Charger.[4]

2. K-9 Puck's Sniff of the 2019 Charger

Defendants next contend that K-9 Puck's sniff did not create probable cause to justify the subsequent search and seizure of the 2019 Charger for three reasons: (1) under Colorado law, Investigator Dortch needed probable cause to deploy K-9 Puck around the 2019 Charger, which he lacked; (2) K-9 Puck is unreliable and therefore does not create probable cause when he alerts to the odor of narcotics; and (3) K-9 Puck did not alert or give a final indication to the odor of narcotics when Investigator Dortch deployed him in and around 2019 Charger. (ECF No. 68 at 11–17; ECF No. 78 at 4–9.)

a. *Whether Colorado Law Applies to K-9 Puck's Sniff*

Under federal law, a trained detection dog walking around a lawfully stopped vehicle does not implicate the Fourth Amendment because the alert only detects the presence of contraband, and people do not have a legitimate expectation of privacy in contraband. *See Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."). Because "society does not recognize a reasonable privacy interest in the public airspace containing the incriminating odor," "police officers do not need an

_____

[4] To the extent Spikes speculates that Officer Ponich actually had a tint meter in his possession and asked Sergeant Carelock to bring a different tint meter to unnecessarily delay

individualized reasonable suspicion of drug-related criminal activity before subjecting a vehicle lawfully detained to a dog sniff." *Morales-Zamora*, 914 F.2d at 205.

However, because certain possession of marijuana is now decriminalized in Colorado, adults have a reasonable expectation of privacy in the lawful activity of possessing marijuana under Colorado law. *People v. Gadberry*, 440 P.3d 449, 452 (Colo. 2019) (recognizing that Article II, Section 7 of the Colorado Constitution provides persons twenty-one years of age or older with a reasonable expectation of privacy in the lawful activity of possessing an ounce or less of marijuana). As such, under Colorado law, "a sniff from a dog trained to alert to marijuana is a search in Colorado that must be supported by probable cause and justified under an exception to the warrant requirement, such as the automobile exception." *People v. McKnight*, 446 P.3d 397, 412 (Colo. 2019).

Defendants argue that because K-9 Puck was trained to alert to marijuana, which is no longer contraband under Colorado law, Investigator Dortch needed probable cause *prior to* deploying K-9 Puck to conduct a sniff of the 2019 Charger. (ECF No. 68 at 12.) According to Defendants, because Investigator Dortch "did not have probable cause to search [the 2019 Charger] without K-9 Puck's alert, the K-9 sniff was conducted in violation of Colorado law, and could not support the affidavit of probable cause" for the March 11, 2019 search warrant for the 2019 Charger. (ECF No. 78 at 8.)

In response, the Government argues that the proper question is whether the governmental action implicates the Fourth Amendment. (ECF No. 72 at 15.) According to the Government, because marijuana remains illegal under federal law, K-9 puck's

the stop, the Court finds such conjecture to be unfounded.

sniff of the 2019 Charger was not a search that required probable cause.  (*Id.*)

Although possessing marijuana may now be legal under Colorado law, it remains illegal under federal law.  *See Gonzalez v. Raich*, 545 U.S. 1, 27 (2005) (observing that the Controlled Substances Act "designates marijuana as contraband for *any* purpose" (emphasis in original)).  It is well-established that federal law—not state law—governs the admissibility of evidence in a federal criminal prosecution.[5]  For example, in *California v. Greenwood*, the Supreme Court recognized that garbage left outside the home for collection was not entitled to Fourth Amendment protection when searched by state officers, even though the California Supreme Court had previously announced a right to privacy to such garbage.  486 U.S. 35, 43 (1988).  As the Supreme Court recognized,

> [i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution.  We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.  We have emphasized instead that the Fourth Amendment analysis must turn on such factors as "our societal understanding that certain areas deserve the most scrupulous protection from government invasion."  We have already concluded that society as a whole possesses no such understanding with regard to garbage left for collection at the side of a public street.  Respondent's argument is no less than a suggestion that concepts of privacy under the laws of each State are to determine the reach of the Fourth Amendment.  We do not accept this submission.

---

[5] In his reply, Defendants argue that federal law "does not preempt Colorado law legalizing . . . marijuana."  (ECF No. 78 at 8.)  This assertion ignores the fact that "[t]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."  *Raich*, 545 U.S. at 29.

*Id.* at 43–44 (internal citations omitted).

The same principle applies here. Just as Fourth Amendment analysis does not turn on California's recognition of a right to privacy in garbage, nor can it turn on Colorado's recognition of an expectation of privacy in the lawful activity of possessing marijuana.[6] *See also United States v. Hayes*, 2020 WL 4034309, at *20 (E.D. Tenn. Feb. 21, 2020) (rejecting argument that state legalization of hemp eliminates probable cause gained by drug detection dog's alert under federal law); *United States v. Hicks*, 722 F. Supp. 2d 829, 833 (E.D. Mich. 2010) (holding that "[i]t is indisputable that state medical-marijuana laws do not, and cannot, supercede federal laws that criminalize the possession of marijuana").

As such, because the Fourth Amendment does not recognize a right to privacy regarding the odor of marijuana, the Court concludes that Investigator Dortch did not need probable cause before deploying K-9 Puck to sniff the 2019 Charger and that K-9 Puck's sniff did not violate Spikes's Fourth Amendment rights. *See Morales-Zamora*, 914 F.2d at 205.

     b.   *Whether K-9 Puck Is Reliable*

The United States Supreme Court has held that "[i]f a bona fide organization has certified a [drug detection] dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides

---

[6] Although Defendants analogize K-9 Puck's sniff to a wiretap, which requires adherence to both federal and state wiretapping standards for admission in a federal prosecution (ECF No. 68 at 14), the comparison is unavailing. Unlike the law surrounding K-9 sniffs, the federal wiretap statute expressly requires all wiretaps to comply with state law as a matter of federal law. *See United States v. McNulty*, 729 F.2d 1243, 1266 (10th Cir. 1983) (en banc) (recognizing that "the federal statute itself requires our deference to Colorado law on the

probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013). However, a defendant can challenge a canine's training and reliability. *See United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011) (noting that "it surely goes without saying that a drug dog's alert establishes probable cause only if that dog is reliable"). "A party seeking to suppress evidence bears the burden of proving the dog is unqualified." *United States v. Clarkson*, 551 F 3d 1196, 1203 (10th Cir. 2009).

In analyzing whether a drug detection dog is reliable, the Supreme Court has recognized the following principles apply:

> If . . . the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe . . . an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

*Harris*, 568 U.S. at 248.

The record demonstrates that K-9 Puck, a Belgian Malinois that was brought to APD in January 2016, underwent six months of training using the Utah POST program to learn how to detect five odors of narcotics: marijuana, cocaine, heroin, methamphetamine, and ecstasy/MDMA. (Tr. I at 19, 22–23.) During the initial six months, he received approximately 300 hours of training with his handler, Investigator Dortch. (Tr. I at 23.) K-9 Puck was thereafter certified on June 3, 2016 following the successful alerts on 15 single-blind hides where neither Investigator Dortch nor K-9

---

question of the validity of the wiretap order obtained in state court under state law").

Puck knew where the narcotics were hidden, or even if narcotics were hidden in the test room at all.  (Tr. I at 25–29.)  Although any false indication or failure to indicate where narcotics were present would have caused K-9 Puck to fail the certification, K-9 Puck passed.  (Tr. I at 29, 32.)  K-9 Puck was thereafter re-certified annually through 2020. (Tr. I at 35.)

In addition to his initial training and annual certification, Investigator Dortch gave K-9 Puck approximately four hours of weekly training.  (Tr. I at 36.)  By the end of March 2019, K-9 Puck had been deployed 136 times and had over 721 training hours.  (Tr. I at 53.)  During those 721 training hours, K-9 Puck never gave a false alert.  (*Id.*)

Defendants nonetheless argue that K-9 Puck is unreliable for "reasons having to do with his certification and training."  (ECF No. 78 at 5; Tr. I at 21.)  Defendants presented expert testimony from Dr. Mary Cablk, who opined, *inter alia*, that K-9 Puck's training was deficient for numerous reasons:

- It is impossible to determine whether the ADP actually adopted the Utah POST training program as they do not have a set of policies and procedures describing how they implement the program (Tr. I at 141–42);

- The Utah POST program includes subjective criterion in its score sheets (Tr. I at 144–45);

- There is no established set of criteria to become a judge or trainer within the Utah POST training facility (Tr. I at 146); and

- A training program should utilize a training program where the K-9 handler does not know whether the training test includes narcotics so that the handler cannot cue or prompt the K-9 (Tr. I at 148).

Defendants also cite the District of Utah's decision in *United States v. Jordan*,

455 F. Supp. 3d 1247 (D. Utah 2020) for the proposition that a dog trained under the Utah POST's training program is unreliable as it does not remove the risk of handler bias or cuing. *Id.* at 1255–56. In that case, the K-9 certification process was not even single-blind, such that the K-9 handler "knows exactly how many hides will be present in the exam and can therefore continue to search until the K[-]9 finds them all." *Id.* at 1256. The *Jordan* court further took issue with the K-9's medical history and the fact that that K-9 only underwent four narcotics trainings in the four months after he was certified. *Id.*

Notwithstanding the fact that Dr. Cablk can envision ways to improve the Utah POST training program, the Court concludes that Defendants have failed to establish that the iteration of the Utah POST training program used by the APD is insufficient, such that K-9 Puck is unqualified or unreliable to detect the odor of narcotics. There is no national standard for narcotics drug dog detection. (Tr. I at 173–74.) *Cf. Ludwig*, 641 F.3d at 1251 n.3 (recognizing that a narcotics detection dog may still be found to be reliable even if he lacks any acceptable certification). Unlike the version of the Utah POST program analyzed by the *Jordan* Court, K-9 Puck's certification process involved 15 single-blind hides, which minimizes the possibility for handler cuing or bias, as neither K-9 Puck nor Investigator Dortch knew where narcotics were hidden (or if narcotics were present in a simulation at all). As such, the Court finds that K-9 Puck's certifications can be taken as proof that K-9 Puck is qualified to reasonably detect, and communicate his detection of, narcotics. *See Ludwig*, 641 F.3d at 1251 (finding dog is reliable where "there is no suggestion that the . . . organization that credentialed the drug dog in this case[] is all smoke and mirrors").

Moreover, while courts generally do not "mount a full-scale statistical inquiry into each dog's history," *see id.*, the facts surrounding K-9 Puck's track record provide ample evidence that K-9 Puck is reliable. Critically, K-9 Puck has *never* given a false alert during his 721 hours of training.[7]

The Court further found one anecdote regarding K-9 Puck's ability to detect the odor of narcotics and Investigator Dortch's ability to identify when K-9 Puck is alerting (and more importantly, when K-9 Puck is *not* alerting) to be particularly persuasive. On that occasion, a postal inspector who frequently worked with Investigator Dortch and K-9 Puck observed K-9 Puck pass over an area containing a suspicious package several times and show interest in the area. (Tr. I at 45.) Although the postal inspector thought that K-9 Puck had alerted to the odor of narcotics, Investigator Dortch recognized K-9 Puck's behavior as the "exact way he acts when we're cooking dinner at home" and informed the postal inspector that he could not use K-9 Puck's behavior to obtain a search warrant for the package. (Tr. I at 45–46.) Thereafter, the postal inspector called Investigator Dortch informed him that the package in question contained two slices of New York City pizza and was "amazed that [Investigator Dortch] was able to tell the difference between the dog sniffing for food and sniffing for narcotics when he had seen Puck, you know, dozens of times and believed this was alerts for narcotics." (Tr. I at 46.)

In light of K-9 Puck's accuracy during trainings and in the field, the Court

---

[7] As Investigator Dortch testified, K-9 Puck's results during the trainings are the best indication of his reliability in detecting the odor of narcotics. After all, in the real world, a dog may alert to the odor of narcotics that have subsequently been moved or are hidden in a location that police are unable to uncover. (Tr. I at 53–54.)

concludes that K-9 Puck's alerts are sufficiently reliable to establish probable cause that the odor of narcotics were present.[8] *Cf. Ludwig*, 641 F.3d at 1252 (recognizing that if it were "pushed" to "get into the business of affixing figures on probable cause," a canine's 58% accuracy percentage would be enough to establish probable cause); *United States v. Anderson*, 367 F. App'x 30, 33 (11th Cir. 2010) (holding dog was reliable with a 55% accuracy rate); *United States v. Koon Chung Wu*, 217 F. App'x 240, 246 (4th Cir. 2007) ("[A]n accuracy rate of 60% is more than reliable enough for [the dog's] alert to have established probable cause"); *United States v. Limares*, 269 F.3d 794, 798 (7th Cir. 2001) (62% accuracy rate suffices to demonstrate probable cause).

c.      *Whether K-9 Puck Alerted to Narcotics in the 2019 Charger*

A positive alert or final indication by a trained narcotics dog is generally enough to give officers probable cause to conduct a search of a vehicle. *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009) (recognizing that a drug-sniffing dog's general alert to odor of illegal substance in vehicle at traffic stop, even without indicating exact source of odor, provided probable cause to search vehicle); *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) ("This court has consistently held that probable cause can be based on alerts by trained dogs.").

During the evidentiary hearing, Investigator Dortch testified that K-9 Puck alerted

---

[8]  Dr. Cablk testified that she would prefer an "objective scoring system" that questions whether the dog finds the hidden narcotics or not.  (Tr. I at 144–45 ("It should be black-and-white.  It should be pass-fail, correct.  . . . The dog finds the hides or it doesn't find the hides. And it really should be as simple as that because that's what we expect on the street.").)  The Court notes that if K-9 Puck were graded according to such a criterion, he undoubtedly would have passed as he never gave a false alert during training.

to the odor of narcotics at the passenger side door and the passenger back side door.[9] (Tr. I at 62–63.) Thereafter, K-9 Puck jumped onto his hind legs, which Investigator Dortch clarified was *not* an alert and instead interpreted as K-9 Puck just "being a dog for a brief period." (Tr. I at 63–65.) As K-9 Puck walked to the driver's side door, he alerted again, rising onto his hind legs as if to get to an odor that is higher up, sniffing intently, and whipping his head. (Tr. I at 65.) Investigator Dortch then deployed K-9 Puck into the interior of the vehicle; K-9 Puck explored the rear of the vehicle before stopping and staring briefly at the front passenger seat and center console area. (Tr. I at 66, 74.) After concluding that K-9 Puck had given a final indication, Investigator Dortch rewarded K-9 Puck with a toy. (Tr. I at 75.)

Defendants argue that the video of evidence of the traffic stop shows that K-9 Puck did not give an alert or final indication to the odor of narcotics in the 2019 Charger. (ECF No. 68 at 15–17.) In support, Defendants produced reports from George Wright, a canine instructor, and Craig Apfel, a private investigator, who each opined that K-9 Puck did not alert to the odor of narcotics when approaching the 2019 Charger and may have instead responded to a toy held by Investigator Dortch. (ECF Nos. 68-3, 68-13.) Dr. Cablk further testified that she did not believe that K-9 Puck alerted or indicated to the odor of narcotics and that K-9 Puck may have been improperly cued by Investigator Dortch.[10] (Tr. I. at 160–70.)

---

[9] The Court notes that the video's vantage point does not entirely capture what occurred on the passenger side of the 2019 Charger as a trash can partially blocks the view. Nonetheless, in observing the video of the encounter, the Court can hear K-9 Puck's nails hitting the car when he raises up onto his hind legs and hits the door with his front paws.

[10] The undersigned does not observe cuing when viewing the video of the encounter.

Here, although Dr. Cablk testified that a dog's alert and final indication should ideally last longer and be something that is readily obvious to everyone (Tr. I at 152), Defendants have not rebutted Investigator Dortch's testimony that *this* dog has high energy and that his stop-and-stare indications may be fleeting.[11]  Nor have Defendants rebutted Investigator Dortch's testimony that he—by training K-9 Puck and living with him on a daily basis—can properly discern between K-9 Puck's ordinary behavior and his alerts and final indications to the odor of narcotics:

> Q. . . . So doesn't that raise a question of how do you know when he's stopping just to stop and when he's stopping when . . . he's indicating an odor of . . . one of those substances?  Isn't that very subjective?
>
> A.  No, sir.  So that comes from my years of training with him and learning his habits.  So when he stops and stares during a narcotics detection is much different than him just stopping and standing looking around.  He's not -- No. 1, he wasn't in the -- I guess focused search for narcotics and I know you don't know K-9 Puck like I do, but K-9 Puck never stops moving, ever.  So if I let him out of his kennel right now, he would not stop moving for the next hour and a half through this house, so when he stops and stares like that, that is a very specific observation or way that he does because he knows he's at the source of a narcotics odor.
>
> . . .
>
> Q. And while you say that they are constantly in motion, for instance if you have a ball in hand, would you say that -- would it be fair to say that if you have a ball in hand and they're ball-driven creatures, they will stop and stare intently at that ball until you have done something with it?

---

[11] The Court found Investigator Dortch's testimony regarding K-9 Puck to be very credible, particularly in light of his descriptions of K-9 Puck's behavior and willingness to readily acknowledge when K-9 Puck was *not* alerting to the presence of narcotics during the encounter with Spikes.

A. No, sir.

Q. You would say that's not the case?

A. That is not the case, no.

Q. Okay.

(Tr. I at 90–92; *see also* Tr. I at 107 ("And I can get that deliberate, clear known indication because of how long I've been working with him.  I spot it pretty much immediately.  So within -- within a second I can spot that he is stopped and has found the source of the odor.").)

After weighing the competing evidence and viewing the video of the traffic stop, the Court finds that K-9 Puck *did* alert to the odor of narcotics outside of the 2019 Charger and thereafter gave a final indication inside the vehicle by stopping and staring at the middle console and passenger side area.  As such, K-9 Puck's positive alert and final indication to the odor of narcotics in the 2019 Charger created probable cause to justify a subsequent warrantless search of the vehicle at the scene of the traffic stop. *See Kennedy*, 131 F.3d at 1378.

        d.     *Subsequent Search of the 2019 Charger at the APD Evidence Bay*

Defendants argue that "APD [O]fficer Forrest completed the inventory search and paperwork before the 2019 Charger was towed to the APD evidence bay," and that "there was no legitimate purpose or reason to further search the [2019] Charger."  (ECF No. 68 at 18.)  As such, Defendants contend that evidence from the 2019 Charger must be suppressed.

In response, the Government contends that once they impounded the 2019 Charger, Investigators Wheelis and Merino were permitted to search the vehicle without

24

first obtaining a search warrant based on the probable cause established by K-9 Puck's positive alert.  (ECF No. 72 at 19–20.)  According to the Government, "[i]t is immaterial if the search occurs at the scene of the traffic stop or at the police exception."  (*Id.* at  20.)

To be sure, the Court is deeply troubled that Investigator Wheelis did not detail his search of the 2019 Charger at the APD evidence bay in police reports or in his affidavit for the search warrant application to search the 2019 Charger's glove compartment.  (*See* ECF No. 108-1 at 9–10.)  But for the fact that the 2019 Charger contained the Dash Camera, it is possible that Investigator Wheelis and Merino's search of the vehicle would never have been uncovered.

Nonetheless, the Court cannot conclude that Investigators Wheelis and Merino's search of the 2019 Charger at the APD evidence bay violates the Fourth Amendment.  After all, K-9 Puck's positive alert to the odor of narcotics emanating from the 2019 Charger created probable cause to believe that the vehicle contained contraband, which justified a warrantless search of the vehicle under the automobile exception.  *See Harris*, 568 U.S. at 246–47; *United States v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005) (recognizing that once probable cause has been established, "the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband").  Although Defendants contend that the automobile exception no longer permits a warrantless after the vehicle has been searched once and towed to an evidence bay, the Court finds no support for Defendants' proposition.  As the Supreme Court has recognized,

> For constitutional purposes, we see no difference between
> on the one hand seizing and holding a car before presenting
> the probable cause issue to a magistrate and on the other

> hand carrying out an immediate search without a warrant.
> Given probable cause to search, either course is reasonable
> under the Fourth Amendment.

*Chambers v. Maroney*, 399 U.S. 42, 52 (1970). Thereafter, in *Texas v. White*, the

Supreme Court concluded that because police had probable cause to search a

defendant's automobile at the scene, it could also search the automobile at the station

house, as "'[t]he probable-cause factor' that developed at the scene 'still obtained at the

station house.'" 423 U.S. 67, 68 (1975) (quoting *Chambers*, 399 U.S. at 52); *see also*

*Florida v. Meyers*, 466 U.S. 380, 380–82 (1984) (upholding second warrantless search

of impounded vehicle after police had already searched the vehicle at the scene);

*Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("It is thus clear that the justification to

conduct such a warrantless search does not vanish once the car has been

immobilized."). Thus, Defendants' arguments that Investigator Wheelis and Merino's

search of the 2019 Charger was unsupported by the automobile exception is unavailing.

Moreover, even assuming that Investigators Wheelis and Merino's search of the

2019 Charger *did* violate the Fourth Amendment, Defendants do not identify any

specific evidence obtained as a result of this search that should be suppressed. *See*

*United States v. Crews*, 445 U.S. 463, 470 (1980) (recognizing that the exclusionary

sanction for Fourth Amendment violations applies to the "fruits" of the violation, such as

"tangible, physical material actually seized in an illegal search."). This deficiency is

particularly significant in this case because Investigator Wheelis subsequently obtained

a search warrant for 2019 Charger. (ECF No. 108-1.) In the Motion to Suppress,

Defendants do not specifically challenge the search warrant for the 2019 Charger, or

otherwise explain why any taint from the illegal search of the vehicle extends to

evidence obtained from the execution of the valid search warrant, particularly when the search warrant does not mention the supposedly illegal search (and therefore the magistrate judge could not have relied upon the illegal search in making a probable cause determination). This is yet another reason to deny this portion of Defendants' Motion to Suppress.

e. *Search of the SD Card & Potential Deletion of SD Videos*

Defendant next contends that APD officers intentionally deleted two March 6, 2019 videos on the SD card from the 2019 Charger's dash camera. (ECF No. 68 at 20–21.) In support of their argument, Defendants hired an expert, Chris Wells, who concluded that two deleted videos were found on, and recovered from, the SD card. (ECF No. 68-8.) According to Defendants, this misconduct violates Defendants' due process rights and that dismissal of the Indictment is appropriate. (ECF No. 68 at 20.)

In response, the Government argues that no video evidence was destroyed. Specifically, the Government contends that it produced in discovery the contents of the SD card, including the two purportedly deleted videos at issue. (ECF No. 72 at 18.) Moreover, the Government contends that the forensic analysis of the SD card contradicts the notion that any videos were deleted. (ECF No. 84 at 1–2.)

During the evidentiary hearing, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent ("SA") Mark Sonnendecker testified that he had used various forensic programs to determine that the two videos in question were considered "both deleted and non-deleted." (Tr. II at 20.) He did not, however, see "any evidence of a file deletion by a person" or any evidence that any file had been edited. (Tr. II at 25–26.) From the evidence presented, SA Sonnendecker opined that "I don't believe these

files were deleted, I believe they were overwritten during the creation of new video files by the operating system." (Tr. II at 34.)

After analyzing the parties' briefs, supporting affidavits, and the evidence presented at the evidentiary hearing, the Court cannot conclude that the SD card's videos were intentionally or unintentionally deleted by any person.

Nonetheless, this conclusion does not end the inquiry into the SD card. After the SD card was seized, APD officers cannot recall where the SD card was taken before it was booked into evidence. (ECF No. 84 at 3.) The Government represents that it is therefore "unable to establish a chain of custody for the SD card" and will not present this evidence at trial. (*Id.* at 3–4.)

Based on the Government's representation that it cannot and will not use the SD card at trial, the Court will suppress the SD card and its contents.

**B.     Search and Seizure of Spikes's Person & the 2018 Charger**

As set forth above, Defendants seek the suppression of all evidence seized: (1) "by law enforcement officers as a result of the search and seizure of Spikes's person, pursuant to [the] Arapahoe County arrest warrant," and (2) by law enforcement officers as a result of the March 28, 2019 search and seizure of the 2018 Dodge Charger." (ECF No. 68 at 1.) However, in their Motion to Suppress, Defendants do not challenge Spikes's Arrest Warrant. Nor do they offer any arguments about why the search of the 2018 Charger violated the Fourth Amendment.

Defendants seem to instead be arguing that taint from the purportedly illegal search and seizure of the 2019 Charger carries over to the subsequent search and seizure of the 2018 Charger and Spikes's arrest. (*See* Tr. II at 227 (THE COURT:

That's the whole question – where does the [fruit of the poisonous tree analysis] stop?

MR. HARTFORD: I don't think it does. THE COURT: So all evidence that's inculpatory

of both defendants gets excluded? MR. HARTFORD: I believe so, Judge.").) The Court

need not reach the issue of whether the fruit of the poisonous tree analysis goes as far

as Defendants suggest, because APD's search of the 2019 Charger did not violate the

Fourth Amendment.[12]

As such, the Court denies the Motion to the extent it seeks suppression of

evidence gained from: (1) Spikes's arrest and subsequent search, or (2) the search of

the 2018 Charger.

**D.      Search of the Wadsworth Apartment & Spoliation of Pole Camera Evidence**

Defendants argue that the loss of the pole camera evidence prejudices them and

that they "have been stripped of their fundamental constitutional rights to investigate,

present a defense," have "no conceivable way of obtaining comparable evidence."

(ECF No. 68 at 24.) According to Defendants, "it would be fundamentally unfair to

permit the Government to go forward with the charge relating to the substance seized

on March 28, 2019 at the Wadsworth apartment" and "[a]t the very least, the

Government should be banned from utilizing at the evidence [*sic*] in trial."[13]  (*Id.*)

_____

[12] Moreover, the Court declines to find that suppression of the SD card mandates the exclusion of any additional evidence at issue in the Motion to Suppress. As set forth below in the portion of the Order denying the *Franks* Motion (*see* Part III, *infra*), even without evidence obtained from the SD card, there is still ample evidence to conclude that the Arrest Warrant was supported by probable cause.

[13] The Court notes that the DPD searched the Wadsworth Apartment pursuant to a search warrant. (ECF No. 72 at 9.) Defendants do not challenge the search warrant itself or argue that the search warrant application would have lacked probable cause without the pole camera footage. As such, even if the Court were to suppress the pole camera footage—which it will not do for the reasons set forth below—the Court is not persuaded that suppression of all of

In *California v. Trombetta*, the Supreme Court recognized that the Government does not have an obligation to preserve every piece of evidence it obtains. Instead,

> [w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. 479, 488–89 (1984). Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Both Defendants are charged with Maintaining a Drug Involved Premises at the Wadsworth Apartment, in violation of 21 U.S.C. § 856(a)(1). Montoya argues that the Government's case against her "hinges on its ability to prove Montoya's 'substantial connection' to this location.'" (ECF No. 68 at 23.) In the sixteen screenshot photographs produced to the defense, Montoya is seen at the Wadsworth Apartment twice and that an unknown female is seen and photographed entering the Wadsworth Apartment with Spikes on March 24, 2019. (*Id.*) According to Montoya, "the surveillance record for the duration of time[ ] [D]efendants are alleged to have committed the pending offenses, showing potential alternate suspects as unknown people are pictured entering and exiting the premises, is potentially exculpatory." (*Id.* at 23–24.)

---

the evidence seized from the Wadsworth Apartment would be an appropriate remedy.

At the evidentiary hearing, Spikes's counsel further cited Sergeant Foster's testimony that DPD did not view or see any criminal activity while surveilling the Wadsworth Apartment. (Tr. II at 240.) He argues that "[w]e are then forced to rely on his word rather than the entire video that could be exculpatory in nature, that has much less import than seeing a video showing no criminal activity, for one." (*Id.*) He further argues that the video evidence could possible be used to refute other evidence against Defendants. (Tr. II at 241.)

In response, the Government contends that "Montoya cannot demonstrate that the pole camera footage of the parking lot of the [Wadsworth] apartment had an apparent exculpatory value before it was overwritten in April 2019." (ECF No. 72 at 22.) According to the Government, the pole camera footage is inculpatory, not exculpatory, as it was consistent with other evidence in this case demonstrating that Montoya maintained the Wadsworth Apartment. (*Id.* at 22–24.) Moreover, because the DPD officers conducting physical surveillance of the Wadsworth Apartment observed Spikes go into the apartment with different women on various occasions, Montoya may still argue that an alternate suspect maintained the Wadsworth Apartment. (*Id.* at 22.)

Although the preservation of the pole camera evidence might conceivably have contributed to Defendants' defense, the Court cannot conclude that the evidence is of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488–89. To the extent Defendants wish to argue that other individuals entered and exited the Wadsworth Apartment, they may still do so using the DPD's surveillance observations. Likewise, Defendants may still argue that DPD officers did not observe any criminal activity from

the exterior of the Wadsworth Apartment.  (Tr. II at 69.)  Thus, the Court finds that Defendants have failed to establish that the lost pole camera evidence meets the standard of constitutional materiality set forth in *Trombetta*.

But even if the Defendants could show that the pole camera footage was uncomparable exculpatory evidence, Defendants' claim would still fail because they presented scant evidence that the Government acted in bad faith.

Defendants argue that bad faith should be inferred because: (1) DPD had let the pole camera surveillance lapse; (2) counsel had requested disclosure of any video evidence in Spikes's state criminal case (Tr. II at 243); and (3) Sergeant Foster purportedly told Spikes during a 2017 encounter, "I don't lose, I'm going to get you," (Tr. II at 246–47).[14]  However, Sergeant Foster testified that the loss of the pole camera footage was unintentional:

> Q. So when did you learn that the video was gone if not
> requested within 30 days?
>
> A. I actually learned about it when I was asked by your office
> for any footage.
>
> Q. And when was that?
>
> A. That actually was probably in June when I was actually
> asked for it because even though I know he was re arrested,
> I think in May is when he was arrested on the federal --
> actual federal warrant, that was when we were notified as far
> as any kind of additional footage of any type.

(Tr. II at 68.)  Likewise, although Spikes's counsel purportedly requested that all video footage be retained when he filed his entry of appearance in the state case, Sergeant

---

[14] During the evidentiary hearing, Sergeant Foster denied this instance, and Spikes chose not to take the stand to rebut Sergeant Foster's testimony.  (Tr. II at 81.)

Foster testified that he did not know about the request.  (Tr. II at 82.)

Based on the available evidence, it appears that the pole camera surveillance footage was lost due to human error, not bad faith.  As such, Defendants' request to suppress evidence obtained from the Wadsworth Apartment is denied.

### III. *FRANKS* MOTION

Defendants seek a *Franks* hearing based on the statements made by Investigator Wheelis in three affidavits: (1) the affidavit in support of the March 11, 2019 Search Warrant for the 2019 Charger; (2) the affidavit in support of the March 20, 2019 Search and Seizure Warrant for the SD card located inside of the 2019 Charger[15]; and (3) the affidavit for the Arrest Warrant for Spikes (collectively, the "Challenged Warrants").  (ECF Nos. 108-1, 108-2, and 108-3.)  To determine whether to grant Defendants' request for a *Franks* hearing, the Court analyzes whether Defendants have established grounds to believe that there may be a Fourth Amendment violation.

**A.    Burden of Proof**

"Generally, if the search or seizure was pursuant to a warrant, the defendant has the burden of [proving that the Government violated the Fourth Amendment]." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) (internal quotation marks omitted).  Defendants offer no argument why the general rule does not apply, nor is the Court aware of one.  Accordingly, Defendants bear the burden here.

**B.    Deferential Review of Warrants & *Franks* Challenges**

The Court's duty

---

[15] Because the Court has suppressed the SD card, any disputes regarding the search warrant for the SD card are moot.  As such, the Court will not analyze statements made, or not

is to ensure that the magistrate judge had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Because of the strong preference for searches conducted pursuant to a warrant, the Supreme Court has instructed [lower courts] to pay great deference to a magistrate judge's determination of probable cause. Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. The test is whether the facts presented in the affidavit would warrant a [person] of reasonable caution to believe that evidence of a crime will be found at the place to be searched.

*United States v. Nolan*, 199 F.3d 1180, 1182–83 (10th Cir. 1999) (internal quotation marks and citations omitted; some alterations incorporated). "The Fourth Amendment requires probable cause to persist from the issuance of a search warrant to its execution." *United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019). In the event that probable cause ceases to exist after a warrant is issued, "the warrant will no longer directly support the ensuing search." *Id.*

A defendant who wishes a reviewing court to consider evidence outside what the warrant-issuing court considered must bring a *Franks* challenge, named for *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant may be entitled to a preliminary evidentiary hearing to challenge the truthfulness of statements in an affidavit sworn in support of a warrant. *Id.* at 155–56. To obtain a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the

made, in support of that search warrant.

affiant in the warrant affidavit." *Id.* at 155–56; *see also United States v. Owens*, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit.").  The defendant must also make a substantial preliminary showing that "the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *Kennedy*, 131 F.3d at 1376.

To demonstrate recklessness, evidence must exist that the officer "entertained serious doubts as to the truth of his allegations . . . and [a] reasonable factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 116 (10th Cir. 1994).  "[T]he standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *Id.* (internal quotation marks omitted).

The Court's task, whether on the face of the pleadings or on the facts as established after a *Franks* hearing, is to reconstruct the warrant as it should have been and then decide whether probable cause existed:

> If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit.  Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (internal quotation marks and citation omitted).  If a district court determines the opponent of the search warrant has

proven his case by a preponderance of evidence at the hearing, then the district court

must suppress the evidence obtained pursuant to the warrant.  *United States v.*

*McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000).

**C.      The Challenged Warrants**

    1.    <u>The March 11, 2019 Search Warrant</u>

    Investigator Wheelis filed an affidavit for a search warrant for the 2019 Charger

while it was located on the APD evidence bay on the basis he believed the vehicle may

contain "[c]ontrolled substances, including Cocaine, Heroin, Marijuana,

Methamphetamine, and Ecstasy (MDMA) as defined in C.R.S. section 18-18-405, 18-

18-406 and 18-18-204."  (ECF No. 108-1 at 3.)

    In the affidavit, Investigator Wheelis stated, *inter alia*, that he and Investigator

Merino were conducting surveillance at the Motel on March 6, 2019, which is "within a

high crime area for crimes which include but are not limited to open air illegal narcotics

sales, prostitution, robbery as well as gang activity." (*Id.* at 5).  He stated that he

> observed numerous subjects walk into this complex and
> enter various motel rooms for short periods of time and then
> exit.  After exiting the motel rooms, these subjects would
> then often walk out and away from this complex.  In addition,
> your Affiant observed numerous vehicles enter the parking
> lot of this complex.  Most often, a subject would then exit
> from various motel rooms and enter the vehicle for a short
> period of time.  Shortly thereafter, the subject would exit the
> vehicle and walk back to the motel room.  The vehicles
> would then proceed to drive away from the location.  Based
> on your Affiant's training and experience, this type of activity
> appears indicative of illegal narcotic sales and/or distribution.
>
> At 11:55 a.m. on March 6, 2019, Investigators Wheelis and
> Merino observed [the 2019 Charger] drive into the parking lot
> of this motel complex.  The driver, who appeared to be a
> black male subject wearing a white t-shirt and jeans, exited

36

the vehicle and proceeded to walk directly up to an unknown black male subject. The two subjects briefly spoke and then walked directly to and entered motel room #205. During the time this subject entered the motel room, your Affiant observed a significant increase in pedestrian foot traffic entering and exiting this motel room. Your Affiant informs the Court that approximately thirteen (13) to fifteen (15) people entered this motel room during a twenty-minute time span. Your Affiant along with Investigator Merino noted that these subjects would enter motel room #205 and then leave approximately thirty seconds to a minute later. Your Affiant informs the Court that this activity also appeared indicative of illegal narcotic sales and/or distribution from within this motel room itself.

(*Id.* at 5–6.) In the affidavit, Investigator Wheelis also detailed events surrounding Officer Ponich's traffic stop of the 2019 Charger, Investigator Dortch's deployment of K-9 Puck and K-9 Puck's positive alert and indication to the odor of a controlled substance near the front passenger seat and glove compartment, Investigator Dortch's initial search of the 2019 Charger, which uncovered a black bag containing numerous clear plastic sandwich bags and four cellular telephones. (*Id.* at 6–9.) Nonetheless, Investigator Wheelis stated that Investigator Dortch was unable to see the contents of the locked glove compartment and that when Spikes was asked to open the glove compartment, "he refused to do so and became increasingly agitated and argumentative." (*Id.* at 9.) According to Investigator Wheelis,

In conclusion, based on the totality of this investigation, your Affiant believes that Mr. Spikes'[s] behavior and previous suspicious activity appears indicative of someone who was using the "Summit View Inn" motel room #205, to possibly sell illegal narcotics. The significant pedestrian foot traffic going in and out of the motel room Mr. Spikes previously occupied, appears consistent with this type of illicit drug activity. Noting that a qualified Aurora Police K9 alerted and indicated for the odor of a controlled substance within this vehicle, coupled with the inability to open the passenger side

> glove compartment, your Affiant believes that there is
> possibly illegal contraband, specifically narcotics contained
> within this locked compartment.

(*Id.* at 10–11.)  Arapahoe County District Court Magistrate Judge Kathleen Janski

signed the search warrant 2019 Charger on March 11, 2019.  (*Id.* at 12.)

### 2.  The Arrest Warrant

Investigator Wheelis also sought an arrest warrant for Spikes on the basis that he

has probable cause that Spikes committed the following crimes: (1) possession with

intent to distribute a schedule II controlled substance (crack cocaine), as defined in

C.R.S. § 18-18-204 and 18-18-405; (2) possession with intent to distribute a schedule II

controlled substance (methamphetamine), as defined in Colo. Rev. Stat. § 18-18-204

and 18-18-405; (3) possession of a weapon by previous offender, as defined in Colo.

Rev. Stat. § 18-12-108; (4) special offender – firearm, as defined in Colo. Rev. Stat. §

18-18-407; (5) theft (firearm), as defined in Colo. Rev. Stat. § 18-4-401; (6) possession

of drug paraphernalia, as defined in Colo. Rev. Stat. § 18-18-428; and (7) unlawful

window tint, as defined in Colo. Rev. Stat. § 42-4-227(1).  (ECF No. 108-3 at 1.)

In the affidavit, Investigator Wheelis detailed the same facts set forth above in

Part III.C.1 regarding his observations at the Motel, K-9 Puck's alerts and indications to

the odor of narcotics in the 2019 Charger, and the evidence obtained from the March 6,

2019 warrantless search of the 2019 Charger.  (*See id.* at 1–8.)  Investigator Wheelis

also described the evidence obtained following the execution of the March 11, 2019

search warrant for the 2019 Charger:

> On March 12, 2019, your Affiant executed the Search
> Warrant on this vehicle which has been secured in an
> enclosed storage facility maintained by the Aurora Police

Department.  At 10:20 AM, your Affiant gained access to the front passenger side glove compartment.  Upon opening it, your Affiant observed a black colored handgun, a clear plastic bag containing a white colored rock like substance (suspected crack cocaine), a clear plastic bag containing a white colored crystalline substance (suspected methamphetamine) and a red and black digital scale.  The firearm . . . contained a magazine with twelve (12) rounds of live 45 caliber ammunition.  In addition, there was an additional live 45 caliber round of ammunition in the chamber.  Aurora Police Department Records Section indicated that this firearm was currently listed as being stolen, via CCIC/NCIC, bearing Aurora Police Department Case [ ].

. . .

Your Affiant conducted a test on the contents of the two (2) clear plastic bags.  The first bag, which contained a white colored crystalline substance tested positive for the presence of methamphetamine with a gross weight of 12.7 grams.  The contents of the second bag contained a white colored rock like substance tested positive for the presence of cocaine with a gross weight of 6.1 grams.  Your Affiant also tested the white residual substance on the digital scale, which also tested positive for cocaine content.  All physical evidence was then secured into the Aurora Police Department's Property Section.

Based on the on the discovery of the above listed narcotics, firearm and digital scale, your Affiant has reason to believe that [Spikes] has and currently sells illegal narcotics, specifically 'crack' cocaine and methamphetamine.

(*Id.* at 10–12.)  Investigator Wheelis also described the videos contained on the SD card.  *Id.* at 13–19.)

## D.    Analysis

Defendants argue that "the Magistrate issued the warrant in reliance upon an affidavit and was victimized by the inclusion of intentional or reckless false statements." (ECF No. 108 at 5.)  Specifically, Defendants contend that at the January 5, 2021

evidentiary hearing, Investigator Wheelis "admitted that he fabricated the amount of people coming in and out of the room and that he didn't have a clear view of the people entering and exiting the room." (*Id.* at 6.) According to Defendants, "[t]he false statement regarding the amount of people entering the room is pivotal to the probable cause determination and bolstering the probable cause language of the search warrant after already executing a searched vehicle." (*Id.* at 7.)

In response, the Government argues that Investigator Wheelis never admitted to making a false statement," that Defendants failed to provide any evidence that Investigator Wheelis's statements were deliberate or reckless falsehoods, and that Defendants cannot show that the approximate number of persons who entered the motel room was material and that but for the statement the Challenged Warrants would not have been issued. (ECF No. 110.)

As an initial matter, the Court notes that Defendants have taken substantial liberties in summarizing Investigator Wheelis's testimony. He did not, as Defendants contend, admit to fabricating the number of people entering an exiting the room. To the contrary, Investigator Wheelis testified as follows:

> Q. . . . you had stated in your arrest affidavit that you observed between 13 and 15 people go in and out of the hotel room, correct?
>
> A. Yes, sir, that's correct.
>
> Q. But that didn't happen, correct?
>
> A. No, that did happen.
>
> Q. Oh, you're saying between 13 and 15 people went in and out of that hotel room?

A. Correct.

Q. You have not had an opportunity to look at the dash cam video that shows only three people going into that room?

A. I have.

Q. And so how do you rectify the dash cam video showing three and your affidavit saying between 13 and 15?

A. Well, from my vantage point, which was across the street, could incorporate one person had a red shirt on, was that person going back in, going back out. I had saw at least those many suggests, people, or individuals, going in and out of this room. So where I stood and my vantage point, if they were the same people I don't know; however, if -- I would be untruthful if I later on saw that video and says, oh, you know what, there's five people going in there. My first observations, that's what I did observe. Now, when you look at the video, yeah, there are I guess three or four of the same people; however, from my vantage point, I couldn't tell that.

Q. So you didn't mention anything about having a difficult vantage point in your affidavit, did you? Yes or no, please?

A. No, I didn't.

Q. Okay. You didn't mention about any -- by any about not being able to see the door or people going in the and out of that room in your affidavit?

A. That's correct.

Q. You didn't give the judicial officer who you gave this affidavit to any indication that you had any problem seeing how many people went in and out of that room, did you?

A. No.

Q. Okay. And of course now that you've seen the dash cam video, you can say that there were not 13 to 15 people that went in and out of that room, correct?

A. Well, I guess if you look at it, I guess that's how you interpret that. So again, I re-emphasize, were they the same people? I don't know. I couldn't say, hey, this person had a white shirt on, oh, he's coming back out, now he's going back in, that's No. 2, or No. 3. I couldn't incorporate that in my observations.

(Tr. II at 121–23.)

At best, Investigator Wheelis's testimony demonstrates that he was mistaken or negligent in describing the number of people who entered or left the motel room. However, nothing from Investigator Wheelis's testimony suggests that he *knew* his statements in the affidavit were false at the time he made them, or that he recklessly disregarded the truth. *See United States v. Ozar*, 50 F.3d 1440, 1445–46 (8th Cir. 1995) (recognizing that the suppression issue should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known). Because Defendants have failed to make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," they are not entitled to a *Franks* hearing. *See Franks*, 438 U.S. at 155–56; *Owens*, 882 F.2d at 1499 ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit.").

Moreover, even if the Court ignored Investigators Wheelis's challenged statements altogether, there is still ample probable cause underlying each of the Challenged Warrants. As explained in Part II.B.2, K-9 Puck alerted and gave a final indication to the odor of narcotics in the 2019 Charger.[16] This fact alone supports the

---

[16] Defendants contention that the warrants are "legally insufficient because they relied on

Magistrate Judge's conclusion that the search warrant for the 2019 Charger was supported by probable cause. (*See* ECF No. 108-1 at 8 ("Investigator Dortch then deployed K9 'Puck' inside of the vehicle where he alerted and indicated to the odor of a controlled substance near the front passenger seat and glove compartment.").) The narcotics and stolen firearm obtained from the 2019 Charger likewise provide ample probable cause for the Arrest Warrant. (*See* ECF No. 108-3 at 10–12.)[17] As such, a *Franks* hearing is unnecessary because Defendants cannot show that the affidavits, "purged of [their] falsities, would not be sufficient to support a finding of probable cause." *Kennedy*, 131 F.3d at 1376.

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS as follows:

1.      Defendants' Joint Motion to Dismiss Indictment Or In The Alternative To Suppress Evidence and Request for Oral Argument (ECF No. 68) is GRANTED IN PART and DENIED IN PART, as set forth above;

2.      The evidence obtained on the SD Card is hereby SUPPRESSED;

3.      Defendants' Joint Motion Requesting a *Franks* Hearing (ECF No. 108) is DENIED; and

4.      The Court will enter a separate Order resetting the trial date and the Final Trial Preparation Conference.

---

the result of the dog sniff, which was unreliable and could not provide probable cause for the search" (ECF No. 112 at 1–2) is unavailing for the same reasons set forth in Part II.B.2.

[17] For the same reason, even ignoring the descriptions of the SD card's evidence, there is sufficient probable cause underlying the Arrest Warrant.

Dated this 10th day of May, 2021.

BY THE COURT:

_____
William J. Martinez
United States District Judge